Adam M. Apton (SBN 316506)
LEVI & KORSINSKY, LLP
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL QUIERO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLOVIN CORPORATION, ADAM FOROUGHI, and MATTHEW STUMPF,<br><br>Defendants. | Civil Action No.: 5:25-cv-2294<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Michael Quiero ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by AppLovin Corporation ("AppLovin" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of AppLovin's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired AppLovin securities between May 10, 2023 and February 25, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning AppLovin's financial growth and stability. Defendants' statements included, among other things, confidence in AppLovin's launch of its AXON 2.0 digital ad platform and using "cutting-edge AI technologies" to more efficiently match advertisements to mobile games, in addition to expanding into web-based marketing and e-commerce. Moreover, Defendants publicly reported impressive financial results, outlooks, and guidance to investors, all while using dishonest advertising practices.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts related to AppLovin's manipulative practices to force unwanted apps on

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

customers using a "backdoor installation scheme" which inaccurately inflated installation numbers, and, in turn its profitability. Such statements absent these material facts caused Plaintiff and other shareholders to purchase AppLovin's securities at artificially inflated prices.

4.     The truth emerged on February 26, 2025, when analyst research reports emerged stating that AppLovin was reverse engineering and exploiting advertising data from Meta Platforms. The reports further alleged AppLovin was utilizing manipulative practices to artificially inglate their own ad click-through and app download rates, such as by having ads click on themselves or utilizing design gimmicks to trigger forced shadow downloads, erroneously inflating installation numbers and, in turn, its profit figures.

5.     Investors and analysts reacted immediately to AppLovin's revelations. The price of AppLovin's stock declined from $377.06 per share on February 25, 2025 to $331.00 per share on February 26, 2025.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant AppLovin is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**THE PARTIES**

11.     Plaintiff purchased AppLovin common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in AppLovin is attached hereto.

12.     AppLovin Corporation is a Delaware corporation with its principal executive offices located at 1100 Page Mill Road, Palo Alto, California 943041. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "APP."

13.     Defendant Adam Foroughi ("Foroughi") was, at all relevant times, the Chief Executive Officer and Chairperson of AppLovin.

14.     Defendant Matthew Stumpf ("Stumpf") was, at all relevant times, the Chief Financial Officer of AppLovin.

15.     Defendants Foroughi and Stumpf are sometimes referred to herein as the "Individual Defendants." AppLovin together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of AppLovin's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

17. AppLovin is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

18. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to AppLovin under respondeat superior and agency principles.

## **SUBSTANTIVE ALLEGATIONS**

### **Company Background**

19. AppLovin Corporation engages in building a software-based platform for advertisers to enhance the marketing and monetization of their content in the United States and internationally. It operates through two segments, Software Platform and Apps.

### **The Defendants Materially Misled Investors Concerning AppLovin's AI-powered AXON 2.0 Digital Ad Platform**

#### *May 10, 2023*

20. On May 10, 2023, AppLovin issued a press release announcing its first quarter 2023 financial results, highlighting, in pertinent part:

> In the first quarter of 2023 we continued to execute against our growth initiatives and exceeded the top end of our guidance. After substantially completing our cost and Apps portfolio optimization projects, our team is focused on three key growth initiatives within our Software Platform segment: 1) upgrading our core machine learning AXON technology; 2) expanding our ad solutions into Connected-TV; and 3) extending our marketing platform to carriers and OEMs.

21. During the same-day earnings call, Defendant Foroughi detailed the improvements made to the AXON platform and the development of AXON 2.0, stating, in relevant part:

> Upgrading from AXON 1 to 2 is no different than OpenAI moving from ChatGPT 3 to 4. Our models can always be improved, and our entire business is powered by the evolution of our technology. The enhancements to our machine learning and AI are not a onetime thing, but a series of upgrades over time. As we make these, there is the potential for significant lifts to both revenue and cash flow. We are currently in the midst of a staged rollout of AXON 2, and we are very excited about the long-term potential of this new technology for our partners and our business.

22. During a question-and-answer portion of the same earnings call, Defendants touted the rollout of AXON 2.0 and its potential to drive growth across the whole advertising sector:

> <Q: Zhihua Yank -Oppenheimer & Co.- Analyst> My first question is on the strength for software platform. And how much did AXON 2 -- will always AXON 2 a meaningful driver for that performance sequentially?
>
> <A: Defendant Foroughi> **And really AXON 2 we talked about, we're now in the midst of a stage rollout, so that came after the quarter. In Q1, we did see improvements in our core technology, the AXON 1.0 version. And incremental improvements in our technology is fundamentally core to our business on an ongoing basis. We also saw more confidence from advertisers spending on our platform as they were seeing good results. And the mindset in the ecosystem is starting to return back to growth. We're seeing good industry momentum as well.**
>
> <Q: Ralph Edward Schackart -William Blair & Company L.L.C - Analyst> Maybe kind of leading to the software business. You talked about the strong growth, and it seems like the market is sort of stabilizing. I know you're not giving full year guidance, but anything that you're seeing currently that would preclude this growth rate sort of persisting through 2023? Or just sort of broadly speaking, how should we think about growth this year on the software business?
>
> <A: Defendant Foroughi> We're really looking at it to sort of building blocks. Last year, obviously, it was difficult for the whole ad ecosystem and the economy in general. Now we're -- we've got one good quarter in place. **The biggest change for us in our business today is we're rolling out AXON 2. It's a material upgrade of our core platform, and we're really excited about it. The team working on this is phenomenal. And so getting this out to market could become a catalyst for our own growth.**
>
> **But we've always talked about our position in this market is quite large in the mobile gaming ecosystem. So if we're able to become more efficient, we'll create growth across the whole sector. And that's what we're really excited about. We think this -- if it continues to go well as we roll this out throughout the rest of the year, we'll be able to create growth in this ecosystem irregardless of what's going on around us.**
>
> <Q: Franco Rafael Granda Penaherrera -D.A. Davidson & Co.- Analyst> I'd like to reference AXON 1 as the same way as AMD references its architectures by saying that they age like fine wine. Are you approaching AXON 2 in a similar way where the efficiency continues to build on top of itself as you continue to iterate on it?
>
> <A: Defendant Foroughi> Yes. I mean the world we live in today with these AI technologies is the fastest evolution and change in technology we've ever

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

seen in our lifetimes. ***The rate of innovation is just incredible. And so as we go to AXON 2, there's, on an ongoing basis, incremental improvements that we can make to the platform. That will fuel our business for some time. And then there's the incremental uptick to AXON 3 and then AXON 4 and AXON 5. This core expertise is going to drive our business for a very, very long time. These technologies are only going to get more powerful. And because of our market-leading position, we've got so much volume flowing through our systems that efficiency gains from these technologies, as they evolve, will generate lifts to revenue. And we've always talked about how our software business technology drive lifts to revenue and a very high flow-through, and that's what we're excited about.***

(Emphasis added.)

<u>*May 8, 2024*</u>

23.     On May 8, 2024, AppLovin issued a press release announcing its first quarter 2024 financial results, reporting, in pertinent part:

> The first quarter marked a strong start to 2024 with outstanding business performance driven by the continued improvement of our AXON technology. We were encouraged to see improvement in the app advertising market with another quarter of year-over-year market growth and a continued shift to real-time bidding. By continuing to innovate and improve our AXON technology, we remain committed to driving growth not just for our company, but for the entire ecosystem we support.
> . . .
>
> Our Software Platform segment grew significantly in the first quarter with Software Platform revenue of $678 million, up 91% year-over-year driven by further improvement of our AXON technology, which continues to benefit from ongoing self-learning, additional data, and engineering enhancements. Our technology improvements contributed to greater return on ad spend (ROAS) for our advertisers, leading to increased investment.

24.     During the corresponding earnings call discussing results, Defendant Foroughi highlighted AppLovin's strong financial growth as a result of the improved performance from AXON, stating in relevant part:

> With AXON 2 turning 1 year old and achieving nearly a full recovery in our share price, after a very difficult 2022, I wanted to reflect on some key themes that we've consistently stated and now actively proven out.
>
> We believe our culture is unique. By staying lean and retaining key contributors, we have built an exceptionally high performing team of

subject matter experts capable of innovating faster and more effectively than those at other companies. We believe our business is not limited by the size of the mobile gaming market, but rather that our business can drive market growth. Advertisers have increased their spend on our platform as a result of the improved performance from AXON.

> ***First, a key driver of our growth will be the ongoing improvements to AXON. Our models are still in an early stage and will continue to improve themselves. But more importantly, our teams are still finding ways to materially improve these algorithms. While these gains may not be predictable, they may sometimes lead to quarters like Q1 where we far exceed expectations. Second, there is nothing that limits our models to just gaming. By expanding into web-based marketing and e-commerce, we expect our AI models to improve with added demand diversity. As we continue to execute on the previously discussed themes, we expect to see further growth in our business.***

(Emphasis added).

25.    On the same call Defendant Stumpf reiterated AppLovin's positive revenue growth for the quarter, stating, in pertinent part:

> ***Our software platform also benefited from technology improvements, including ongoing self-learning, additional data and enhancements by our engineering team. We continue to be optimistic about our ability to drive compounding efficiencies leading to improved performance for our advertising partners.*** Our Apps portfolio remained stable from last quarter, maintaining 15% adjusted EBITDA margin.

> Turning to our second quarter guidance. We expect to deliver between $1.06 billion and $1.08 billion in revenue. Adjusted EBITDA is expected to be within the range of $550 million and $570 million. That represents an adjusted EBITDA margin between 52% and 53%. In conclusion, we continue to have confidence in our ability to drive growth from our core business while we work to expand our long-term opportunities.

(Emphasis added).

26.    During the question-and-answer segment of the same earnings call, Defendants were asked about AppLovin's AppDiscovery platform and software, specifically AXON 2.0 and how it has fueled positive growth in the last year, stating in part:

> <Q: William Lampen- BTIG, LLC- Analyst> You mentioned in the prepared remarks that this quarter results exceeded your internal expectations. Is there anything specific that you might call out for us amongst the sort of key sources of outperformance? And then I guess sort

of second and bigger picture, as we think about the trajectory for software and AppDiscovery after a couple of quarters of really strong sequential revenue growth, I think there's some concern percolating that once we anniversary the start of the AXON cycle that maybe growth starts to asymptote. Could you help us frame up, I guess, current momentum and the runway that you see within both the core gaming market and new channels like e-commerce?

<A: Defendant Foroughi > So on the first one, I touched on this in the script. *But we've got a few growth vectors. One is going to be adding more advertisers both within gaming and then breaking out to these new verticals that we're working on and quite excited about. Secondarily and more importantly, anytime we see improvements in our core models, we see gains in our business. And there's 2 forms of improvements. These models are self-learning. So we've got them in the marketplace. We're serving a ton of impressions every single day. And there's a feedback loop that gets this data back into the model and it improves itself. So there's a component of that. That's why the system continues to get better since we launched it.*

And the second piece is our team, obviously, is still working every single day. So every time our research science team creates some sort of innovation or breakthrough on those models, that ends up a step function gain in the business. Because if you think about these models, it's all math and if the math gets more accurate, then we're going to see a gain in the business. And these are very high-margin gains because there's no cost associated with that gain, there's no sales process to go bank that gain, it's just a gain in the business. And so I try to tie it back to the first quarter and performing really well against obviously the toughest quarter in advertising against Q4. The gain we saw in the first quarter was predominantly due to just enhancements to the models themselves. And so that's going to be one of our core drivers going forward.

Now to the question of the software growth is slow, look, software is growing about 90%, 100% year-over-year, and it's a 73% margin business. So we don't need it to grow double every single year. It's a net revenue reported business on the vast, vast majority of the revenue. So every incremental dollar is very, very high margin.

. . .

Now we're the best in the world today at driving value to mobile gaming advertisers, and there's nothing that limits our technology from working outside gaming, how good could we be in other verticals. So the vertical expansion is a key part of our focus. And then beyond that, we're in the business of creating improvements to our technology. So if you start adding all that up, how do we keep growing this business, there's a lot of levers that we have to pull to be really excited. And that's why it ended with we've never been more excited about the prospects we have in front of us than we are today.

8

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<Q: Ralph Edward Schackart- William Blair & Company- Analyst> You've been fairly consistent in saying that AXON 2 engine works outside sort of the gaming vertical, and you sort of touched on that in your last response. Can you maybe give an update sort of where you are in that sort of effort outside of gaming? Do you need a new sales force? Are you testing? Any results you could share, sort of want to get a sense of sort of where you are in that effort.

<A: Defendant Foroughi> And a couple of things. One is, we look at the advertising world with apps and websites, right? Like there's 2 forms of media that people are buying to the end destination. And today in the app marketing world, we're very good at gaming. ***We also work with nongaming apps, and we've seen success once we rolled out AXON 2 across a variety of nongaming companies growing on our platform, too. And I think last call, we touched on that the non-gaming app space is growing faster than the gaming app space on our platform just because it starts from a lower base.***

***That success hasn't changed. We still see the same trajectory. Now what has us excited and what we've been working on is launching the first form of web advertising on our platform. And if you think about a lot of transactional industries, e-commerce, in particular, most of the transactions are still done on the website, not the mobile application because a lot of shops don't even have a mobile application. And so that's been work we've been doing. We will be bringing that product to market this quarter, and it's something we're very, very excited about as a way to really build out a lot more demand density into our platform.***

<Q: Jason Boisvert Bazinet – Citigroup Inc.- Analyst> Would you mind just giving us an update on your sales process? I remember several years ago, you sort of made fun of yourself because you didn't really have a sales force and didn't think about it. And I'm just trying to get a sense. You haven't talked about it as a vector. But is all of this growth we're seeing a function of sales and the technology? Or is it just purely the technology and it's sort of selling itself based on the return...

<A: Defendant Foroughi> ***We believe if we build great products and we innovate well, that if the advertisers are seeing success on our platform, they're going to tell their peers and their peers are going to come to our platform and this thing could self-sell itself. And we've seen that happen in mobile gaming as AXON 2 continues to perform well.***
. . .

When we look at outside of gaming, we're still -- we have no interest in getting into brand advertising. So everything is performance-based. We fundamentally want to play -- replay the same playbook, where we're not going to invest heavily in sales now. In some of these transactional

9

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

categories outside gaming, you do need some presence, some marketing, some sales, but it's not going to be a heavy investment.

*And we do believe that if we're able to go drive the same result where, for instance, in e-commerce to shop, see a lot of benefit from marketing on our platform and they can measure the result and they see a stronger result on our platform and some of the other channels they buy on, there's going to be a lot of interest because these other transactionally charged categories desperately need more marketing available to them as those industries are struggling to grow themselves.*

<Q: Omar Dessouky – Bank of America Securities- Analyst> I didn't see net revenue for install growth on your letter. Could you update us on that and give us any kind of the puts and takes around that?

<A: Defendant Foroughi> *But similar to prior quarters, we've had an increase in both the net revenue per install as well as the volume of installations, and that's through the continued improvement of AXON that we've been talking about. As the technology continues to improve, we should see both a growth in the amount of money that we're making per installation and volume of install as we see more advertisers increasing their spend.*

(Emphasis added.)

*November  6, 2024*

27.    On November 6, 2024, AppLovin issued a press release announcing its third quarter 2024 financial results, highlighting, in relevant part:

Our AXON models continue to improve through self-learning and, more importantly this quarter, from technology enhancements by our engineering team. As we continue to improve our models our advertising partners are able to successfully spend at a greater scale. We're proud to be a catalyst to reinvigorating growth in our industry.
. . .

Our Software Platform segment continued to grow in the third quarter, with Software Platform revenue of $835 million, up 66% year-over-year, driven by continued development of our AXON engine through ongoing self-learning and directed model enhancements. These technology enhancements allowed our advertising partners to further increase the scale of their spend on our platform while consistently achieving their return on ad spend ("ROAS") goals.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

28. During an earnings call held the same day, Defendant Foroughi touted the Company's positive growth driven by enhancements to its AXON algorithm and AI software development, stating, in pertinent part:

> We continue to execute well, expanding our core business and laying the groundwork for its sustained growth. Last quarter, I shared our confidence in achieving 20% to 30% year-over-year growth for the foreseeable future. We continue to expect 4% to 5% quarterly growth through self-learning and market growth, with occasional step changes resulting from enhancements to our AXON algorithm.
>
> ***This quarter, we saw one of those step changes, with meaningful growth driven by advancements to AXON. While we can't predict the timing of these breakthroughs, we are in the early stages of AI software development, both within our company and in the broader industry. We expect ongoing research advancements to continue driving our technology forward.***
>
> While we remain confident in 20% to 30% growth for mobile gaming advertisers alone, we're also exploring new areas, as shown by our recent e-commerce pilot. Early data has exceeded our expectations, with the advertisers in the pilot seeing substantial returns, often surpassing those from other media channels and, in many cases, experiencing nearly 100% incrementality from our traffic.
>
> (Emphasis added.)

29. On the same call, Defendant Stumpf attributed AppLovin's positive third quarter revenue growth to AXON enhancements, stating, in part:

> ***During the quarter, improvements in our AXON technology, driven by ongoing self-learning, and enhancements by our engineering team contributed to further growth of our software platform.*** This segment generated $835 million in revenue and $653 million in adjusted EBITDA, achieving a 78% margin and growing 66% in revenue and 79% in adjusted EBITDA from the same period last year. Quarter-over-quarter flow-through from revenue to adjusted EBITDA was 107%.
> . . .
> Our Apps revenue for the quarter was $363 million, a 1% increase from last year, with $68 million in adjusted EBITDA representing a 19% margin. We continue to expect the Apps business to be stable in the future. We believe a strong capital structure and effective capital allocation plan are crucial to the creation of long-term shareholder value. To that end, we're focused on a few areas.
>
> (Emphasis added.)

11
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

30.     During the question-and-answer segment of the same earnings call, Defendants were asked by analysts about the possibility of expanding from gaming into e-commerce using AXON 2.0, stating, in relevant part:

> <Q: Matthew Andrew Cost – Morgan Stanley- Analyst> f you can move beyond gaming, do you believe you can move to other verticals?
>
> <A: Defendant Foroughi> 10 years from now, we think every advertiser that has a transactional model, whether it's collecting an e-mail address for a newsletter or a local pizza shop or an e-commerce brand or a gambling brand or a gaming brand or anything across any category, can buy on our platform and do it at scale. So there's no limitation to the power of the math and the technology that we've written.
>
> ***But the only limitation, the only reason why we referenced it as e-commerce today is the go-to-market. We do want to be thoughtful about how we penetrate new categories. But even inside e-commerce, we're not approaching it as we're only going to go to fashion and then we're going to go to beauty. We're approaching it as we're going to go to the entirety of e-commerce, and then we're going to go to the entirety of the rest of the categories of advertising that matter. And then hopefully, we're going to go to the whole world of transactional businesses over time.***
>
> <Q: Vasily Karasyov – Cannonball Research- Analyst> So can you help us understand this e-commerce opportunity?
>
> Is it just taking AXON 2.0 as it is and just making minor tweaks so that it just selects for targeted potential e-commerce customers? Or is it a big overhaul? And then how much of an advantage will you be able to take from the gaming and take it to e-commerce? And who -- if you can, whom will you be competing against? Who is currently taking up those budgets?
>
> <A: Defendant Foroughi> So starting with like competition. I don't think, to date, anyone has delivered a solution inside mobile games for categories outside of gaming. And so we're going into greenfield. And what's exciting about these shops, and I said this on my talk track, when they're marketing on our platform today, this is a new audience.
>
> ***They're not otherwise able to reach this audience in that moment in time. So when we're able to show an ad for them and do it precisely and measure it all, there's an immense amount of incremental value for them from that advertisement. So it's a really strong solution for them.***
>
> ***So it will continue to make our platform able to monetize that audience better, which is going to be a huge boon for our business and very healthy for the publisher as well, who will generate more dollars from their users,***

*but also get more diversity of content to their users. And in this case, if you're a game publisher, an e-commerce ad is not for someone who is building another game, it's for something that is completely different than your product. So it's a great win-win for all parties involved.*

*On the technology side, I never like to talk about complexities of technology. I certainly wouldn't say anything we do is simple. I don't think a lot of people in the world, I mean, maybe hundreds, max, engineers understand how to build these types of platforms. We've seen very few, only a handful of software implementations that are compelling at scale inside what we're calling these AI technologies, and we're one of those.*

And our engineers are building really complicated technologies that can do a lot more than just the first implementation did, which was drive performance marketing to gaming. So we think there's going to be a lot of expansion opportunity over time. The technology platform is really powerful, and math is not limited to categories. So there's going to be, I think, years of growth ahead of us.

<Q: Zhihua Yang– Oppenheimer & Co.- Analyst> On gaming, do you think your customers are responding pretty consistently to step-up in AXON 2.0's performance? Is there certain customers that will ramp up spending faster than the others?

<A: Defendant Foroughi> No. *Like I said, it's the most exciting product that we've ever launched. We've never seen this kind of data on a new product. And if you recall, I mean, I don't voice optimism much since we've gone public on new products. We've talked about a lot of products. We are a very entrepreneurial company. We will try a lot of things. But the last time I talked about a really good product was when we launched AXON 2.0. That turned out pretty good for us, our company, our partners and our investors.*

*So if we're talking about this product as being the most compelling one we've seen yet, that you can assume we're not running into bottlenecks, other than like we just don't have the capacity yet in terms of human capital and every solution component automated to scale it out as quickly as the market demands. So we've got to line out the door of companies that want to jump on to this platform.*

(Emphasis added.)

*February 12, 2025*

31.     On February 12, 2025, AppLovin issued a press release announcing positive financial results for the fourth quarter 2024, reporting, in pertinent part:

13

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

From the outset, we committed to building products that not only automated marketing but also delivered measurable incremental earnings. We wanted to design a platform to help our customers spend every dollar on acquiring users profitably and transparently. This principle continues to guide the innovations we deliver to our partners.

***These principles were on full display in 2024, a year that not only brought significant growth— marked by a remarkable 75% increase in revenue in our advertising business1—but also showcased the transformative potential of AI and automation. We've spent several quarters optimizing our teams to embrace automation, knowing the world is moving in this direction. We believe those who view these technologies as allies, rather than threats, will unlock extraordinary potential and we aim to lead by example.***

. . .

As we look ahead to 2025, I'm excited by several key initiatives that will drive our next phase of growth:

1. Advancing Our Models We are still in the early stages of improving our advertising AI models. The roadmap ahead is filled with opportunities for iteration, and as we execute, we believe we can continue to drive value creation for our shareholders.

2. Personalizing Ad Experiences Our ad experience today is static, where users see similar looking advertisements created by humans. With AI, we aim to scale this process exponentially by creating countless iterations and dynamically selecting personalized creatives for each user. This will unlock improved consumer engagement and response.

3. Automating Our Dashboard In 2025, we plan to launch a self-service dashboard powered by AI agents to help our customers manage their campaigns.

(Emphasis added.)

32. Defendant Foroughi continued to tout the Company's use of AI technologies to drive growth, stating, in part:

Over the last few years, our team has achieved extraordinary things. ***We've built an advertising model as powerful as any advertising AI model in the world, delivering measurable success for our partners. Early adopters in gaming and direct-to-consumer commerce have already seen the impact of our technology, and our mission is clear: to onboard every business that wants to drive measurable growth.***

14

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> We are driven by the belief that our technology can positively impact the global economy. By helping businesses of all kinds efficiently connect with their audiences, we unlock their potential to grow and thrive.

> (Emphasis added.)

33. An earnings call was held the same day, wherein Defendant Foroughi discussed the substantial gains made by AppLovin since the AXON upgrade in 2023, stating, in relevant part:

> Q4 was a major milestone, arguably our most foundational period since the AXON upgrade in 2023. For the first time, we captured meaningful holiday shopping advertising dollars and witnessed the impact of an advertising category beyond solely gaming contributing to our growth. I'm sure many of you are curious about how much revenue our e-commerce category contributed.

> In line with this expanding focus on advertising, we've been assessing how best to invest our resources to serve the needs of a global client base. Seven years ago, we began acquiring gaming studios to help train our earliest machine learning models, an invaluable step in shaping the AI that underpins our AXON platform. However, we've never been a game developer at heart. We have immense respect for the creativity it takes to build games, including from teams in our studios.

34. During the question-and-answer portion of the call, William Blair analyst asked about the Company's expansion into e-commerce in 2025:

> <Q: Ralph Edward Schackart – William Blair- Analyst> But just in terms of e-commerce, obviously, a lot of excitement here, and things seem to be going really well. Do you still -- I think, before, you've talked about it contributing to be a material contribution in 2025.

> <A: Defendant Stumpf> ***We still feel very confident, Ralph, in the ability for us to contribute a material portion of revenue from the e-commerce opportunity in 2025.*** But again, it's very difficult to predict when and how much that growth is going to come in during the period in 2025. So I think we'll see it when it comes, and then we'll provide more details there.

> <A: Defendant Foroughi> And then what I've given consistently is, look, our business predictably has got 20% year-over-year growth in it. And that's from just the baseline of operating within the category that we've always traditionally operated.

> And then you've got these things that can drive material upside that's really exciting for us. They're unpredictable. And when things are unpredictable, a lot of times people assume they're going to be unpredictably bad. ***Well, in***

15

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*our business, we've got 2 things that could be unpredictably really good. One is these model enhancements. We're really, really early still in AI development and research, both inside our company and then obviously externally, too. This is not a field that's mature. It's early in its existence. It's only going to get better. And when our models get better, we've all seen the impact to revenue.*

(Emphasis added.)

35.    The above statements in Paragraphs 20 to 34 were false and/or materially misleading. Defendants created the false impression that AppLovin's  enhanced AXON 2.0 digital ad platform, in addition to is "cutting-edge AI technologies" would more efficiently match advertisements to mobile games, in addition to expanding into web-based marketing and e-commerce. In truth, AppLovin is exploiting advert data from Meta Platforms and using manipulative practices that forced unwanted apps on customers via a "backdoor installation scheme" which inaccurately inflated installation numbers, and, in turn, its profit figures.

### The Truth Emerges

#### *February 26, 2025*

36.    On February 26, 2025, Culper Research and Fuzzy Panda Research published reports that AppLovin's AI-powered AXON 2.0 digital ad platform is a façade and not the main driver in the Company's recent financial growth. The reports claim that AppLovin uses manipulative practices, such as exploiting app permissions in order to carry out installations without users noticing, thereby erroneously inflating installation numbers, and, in turn, profit figures. Additionally, the reports find that AppLovin is reverse engineering and exploiting advert data from Meta Platforms to make it appear that their e-commerce segment is performing better than it is.

37.    Based on their findings, Culper Research discovered that from approximately late 2022 to at least late 2024, around the time AppLovin's high margin software revenue began skyrocketing, the Company uncovered a code which enabled AppLovin to directly download apps onto consumers' phones without prior knowledge or approval. Culper reports, "[t]he permission allows the apps to "bind" to AppHub, effectively borrowing or inheriting AppHub's one-click

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

direct install permissions as their own. This permission is presently embedded within many of the most popular free-to-play games in the world, including Subway Surfers, 8 Ball Pool, Wordscapes, and Angry Birds 2."

38.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the press releases and associated earnings calls held on May 10, 2023, May 8, 2024, November 6, 2024 and February 12, 2025. During the earnings calls and related statements, AppLovin's executives continually touted the new and improved AXON 2.0 platform and cutting edge AI technologies as the main reason why the Company has seen exponential growth since 2022. In actuality, AppLovin used manipulative practices that forced unwanted apps on customers via a "backdoor installation scheme" in order to erroneously inflate installation numbers, and, in turn, its profit numbers.

39.     As a result, investors and analysts reacted immediately to AppLovin's revelations. The price of AppLovin's stock declined from $377.06 per share on February 25, 2025 to $331.00 per share on February 26, 2025.

**Loss Causation and Economic Loss**

40.     During the Class Period, as detailed herein, AppLovin and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AppLovin's common stock and operated as a fraud or deceit on Class Period purchasers of AppLovin's common stock by materially misleading the investing public. Later, when AppLovin and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of AppLovin's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of AppLovin's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

41.     AppLovin's stock price fell in response to the corrective event on February 26, 2025, as alleged *supra*. On February 26, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning AppLovin's financial growth and stability.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

42.     In particular, on February 26, 2025, Culper Research and Fuzzy Panda published research reports stating AppLovin was reverse-engineering and exploiting advertising data from Meta Platforms. The reports further allege AppLovin was utilizing manipulative practices to drive their own ad click-through and app download rates higher, such as by having ads click on themselves or utilizing design gimmicks to trigger forced shadow downloads, erroneously inflating installation numbers and, in turn, its profit figures.

### Presumption of Reliance; Fraud-On-The-Market

43.     At all relevant times, the market for AppLovin's common stock was an efficient market for the following reasons, among others:

(a)     AppLovin's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     AppLovin communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     AppLovin was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about AppLovin was reflected in and incorporated into the Company's stock price during the Class Period.

44.     As a result of the foregoing, the market for AppLovin's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in AppLovin's stock price. Under these circumstances, all purchasers of AppLovin's common stock during the Class Period suffered similar injury through their purchase of AppLovin's common stock at artificially inflated prices, and a presumption of reliance applies.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

45.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

46.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with materially misleading statements about its financial growth and stability while at the same time omitting then existing material adverse information concerning the Company's advertising practices. Defendants provided the public with information about their operations that failed to account for negative realities concerning their undisclosed conduct.

47.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

48.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of AppLovin who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**CLASS ACTION ALLEGATIONS**

49.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired AppLovin's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

50.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AppLovin's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AppLovin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 24, 2025, there were 309 million shares of the Company's Class A common stock outstanding and 30 million shares of the Company's Class B common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

51.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

53.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AppLovin;

(c)    whether the Individual Defendants caused AppLovin to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of AppLovin's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against All Defendants for Violations of
### Section 10(b) and Rule 10b-5 Promulgated Thereunder

55.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

56.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AppLovin common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire AppLovin's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

58.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for AppLovin's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

59.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants

1    were committed willfully or with reckless disregard for the truth. In addition, each defendant

2    knew or recklessly disregarded that material facts were being misrepresented or omitted as

3    described above.

4    60.    Information showing that Defendants acted knowingly or with reckless disregard

5    for the truth is peculiarly within defendants' knowledge and control. As the senior managers

6    and/or directors of the Company, the Individual Defendants had knowledge of the details of

7    AppLovin's internal affairs.

8    61.    The Individual Defendants are liable both directly and indirectly for the wrongs

9    complained of herein. Because of their positions of control and authority, the Individual

10    Defendants were able to and did, directly or indirectly, control the content of the statements of

11    the Company. As officers and/or directors of a publicly-held company, the Individual Defendants

12    had a duty to disseminate timely, accurate, and truthful information with respect to AppLovin's

13    businesses, operations, future financial condition and future prospects. As a result of the

14    dissemination of the aforementioned false and misleading reports, releases and public statements,

15    the market price of AppLovin's common stock was artificially inflated throughout the Class

16    Period. In ignorance of the adverse facts concerning the Company which were concealed by

17    Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired

18    AppLovin's common stock at artificially inflated prices and relied upon the price of the common

19    stock, the integrity of the market for the common stock and/or upon statements disseminated by

20    Defendants, and were damaged thereby.

21    62.    During the Class Period, AppLovin's common stock was traded on an active and

22    efficient market. Plaintiff and the other members of the Class, relying on the materially false and

23    misleading statements described herein, which the defendants made, issued or caused to be

24    disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

25    of AppLovin's common stock at prices artificially inflated by defendants' wrongful conduct. Had

26    Plaintiff and the other members of the Class known the truth, they would not have purchased or

27    otherwise acquired said common stock, or would not have purchased or otherwise acquired them

28    at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   and the Class, the true value of AppLovin's common stock was substantially lower than the prices

2   paid by Plaintiff and the other members of the Class. The market price of AppLovin's common

3   stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff

4   and Class members.

5         63.    By reason of the conduct alleged herein, Defendants knowingly or recklessly,

6   directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5

7   promulgated thereunder.

8         64.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

9   other members of the Class suffered damages in connection with their respective purchases,

10  acquisitions and sales of the Company's common stock during the Class Period, upon the

11  disclosure that the Company had been disseminating misrepresented financial statements to the

12  investing public.

13  **COUNT II**

14  ***Against the Individual Defendants***
***for Violations of Section 20(a) of the Exchange Act***

15

16        65.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

17  paragraphs as if fully set forth herein.

18        66.    During the Class Period, the Individual Defendants participated in the operation

19  and management of the Company, and conducted and participated, directly and indirectly, in the

20  conduct of the Company's business affairs. Because of their senior positions, they knew the

21  adverse non-public information about AppLovin's misstatements.

22        67.    As officers and/or directors of a publicly owned company, the Individual

23  Defendants had a duty to disseminate accurate and truthful information, and to correct promptly

24  any public statements issued by AppLovin which had become materially false or misleading.

25        68.    Because of their positions of control and authority as senior officers, the Individual

26  Defendants were able to, and did, control the contents of the various reports, press releases and

27  public filings which AppLovin disseminated in the marketplace during the Class Period

28  concerning the misrepresentations. Throughout the Class Period, the Individual Defendants

24
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

exercised their power and authority to cause AppLovin to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AppLovin's common stock.

69.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, AppLovin to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

70.    By reason of the above conduct, the Individual Defendants and/or AppLovin are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: March 5, 2025                    Respectfully Submitted,

**LEVI & KORSINSKY, LLP**


/s/ Adam Apton
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS